[Civ. No. 6122. First Appellate District, Division Two.—February 10, 1928.]

ELMER R. SLY, Appellant, v. WILLIAM ABBOTT et al., Respondents.

Joseph F. Seymour and Frank J. McDougal for Appellant.

W. D. Van Nostran and Glen Behymer for Respondents.

KOFORD, P. J.—Defendant William Abbott was engaged in the real estate business. He contracted to purchase a large number of real estate lots from John A. Van Pelt and associates and also from the Pen Bryn Land Company. Thereupon he turned about and associated with himself the plaintiff Sly, J. W. Allen and later Richard Eagan. These four men, as a result of written and verbal agreements executed amongst themselves, became, as contended by appellant, joint adventurers with the object in view of completing the purchase of said lots from the original owners, and selling them out piecemeal to the public at a profit. The more important details of the steps taken by which these four men formed this syndicate and later separated are as follows: First, there were four documents executed between the eighteenth and the twenty-second days of January, 1923, by which the plaintiff Sly and his associate J. W. Allen agreed to purchase said lots from defendant William Abbott by making an initial payment and agreeing to make subsequent installment payments extending over a consider-

able period of time. The first in date of these four documents is a memorandum of agreement made the eighteenth day of January, 1923. Time was expressly made the essence of the agreement. Therein plaintiff Sly and associate Allen paid $150 down and agreed to pay, among other installments, the aggregate of $1,500 within thirty days and the sum of $5,150 within ninety days, which would mean April 18, 1923. The other three documents were less formal, each being simply a receipt signed by defendant Abbott acknowledging receipt from plaintiff Sly and his associate Allen of a deposit and part payment on account of the purchase of certain groups of the said lots of real estate and designating the total price and the times for the installment payments on the balance of the purchase price. These receipts contemplated a more formal contract to be made a few days later when further payments were to be made. Thereafter plaintiff Sly persuaded Richard Eagan to join the enterprise. Eagan paid $4,000 for the privilege and such agreements were had, oral and written, that all the previous contracts and agreements between the four parties were on the twenty-ninth day of January, 1923, merged into one contract between the plaintiff Sly, defendant Abbott, J. W. Allen, and Richard Eagan. Each of these four men then became, according to the findings, the owner of an undivided one-fourth interest in and to any rights, equities, or profits to accrue from the sale of the said real estate lots. As part of the consideration of said merger agreement, plaintiff Sly had theretofore agreed to pay defendant Abbott $5,150 on the eighteenth day of April, 1923. This is the same sum which he was obliged to pay under the memorandum agreement above referred to and dated January 18, 1923. Of this sum plaintiff Sly, together with Allen, had previously paid $150. J. W. Allen on the first day of April, 1923, withdrew from the syndicate assigning all his interest to the remaining three, Sly, Abbott, and Eagan.

On the eighteenth day of April, 1923, a conference was had at which all interested parties were present. What happened at this conference forms the important part of this case. Payments due to the original owners, Van Pelt and Pen Bryn Land Company, were in default. The payment of $5,000, which Sly had agreed to pay to Abbott on the

18th of April, 1923, had not been made. The clear weight of the testimony, and as found by the trial court, shows that at this meeting the following occurred: Mr. Lincoln, an attorney at law, representing the original owners, required and demanded of each of the members of the syndicate that the overdue payments due to the original owners be paid at once. The response of the members of the syndicate was as follows: Abbott said he was waiting for Sly to pay him the $5,000. J. W. Allen said that he had already sold out and was present to collect a balance due him on that account. Richard Eagan said that he would not put up another cent; that he had gone into the syndicate under misrepresentations; that he wanted nothing so much as to get his money back and return to Boston. Plaintiff Sly said in effect: I have no money and cannot borrow any and cannot pay a cent, but if you will take care of Eagan I will be satisfied to drop out and surrender my interest. Thereupon Lincoln and defendant Gray, who was also present at the conference and who subsequently bought out Abbott's interest, conferred together and agreed to take care of Eagan. This was subsequently done. They bought out Eagan. The conference adjourned and thereafter Abbott, Gray and successors carried on the enterprise with their own funds.

According to this verson of the conference all of the four members of the syndicate had withdrawn except Abbott and this was Abbott's attitude as expressed by his answer filed in this suit.

The plaintiff Sly, however, denying the essential features of the conference as we have outlined them above, claimed that he had not withdrawn or surrendered, but that he still remained in the syndicate. He filed this action based upon that claim. The complaint alleged in effect that Abbott had taken matters into his own hands and had made a large profit, of which the plaintiff's share was some $34,000; that plaintiff Sly was the owner of an undivided one-half interest in the syndicate, lots and profits; that defendant Abbott had wrongfully secured and retained for himself certain commissions and also a secret profit by turning into the syndicate certain lots at a higher price than that which he had paid for the same; that by reason of these two things

Abbott owed plaintiff in excess of the $5,000 which Sly was in default to Abbott under his contracts. The complaint followed this with an allegation that the plaintiff was ready, willing, and able to perform his obligations and to pay any sums of money due to Abbott if any be due to him.

The findings of the court were that it was untrue that Abbott had received any secret commissions and found that it was untrue that said defendant Abbott had made a secret profit of $5,000 as alleged by the plaintiff. The court also found that the plaintiff was not ready, willing, and able to fulfill his obligations and make the payments as required by his agreements, particularly the contract of January 18, 1923, and, further, that plaintiff Sly defaulted in the payment of $5,000 due Abbott on the 19th of April, 1923, and further defaulted in the payment of his share of overdue payments of $3,600 to the original owners of the land. The court further found expressly and in detail upon the occurrences taking place at the conference of April 19, 1923, and these findings state the facts substantially as we have outlined them above, which include the statement that Sly had agreed to surrender his interest if defendants Abbott and Gray would buy out Eagan and that Abbott and Gray had done so.

Going further with reference to this conference, the court also found that Sly did then and there abandon and relinquish all his rights and still further that the action of Sly in so abandoning his interest had created an estoppel precluding him from asserting any interest in the property or in the profits.

Practically all of the points urged by appellant on this appeal are based upon the contention that the findings of the court of abandonment, relinquishment, and estoppel are outside of the issues raised by the pleadings. The pleadings were as follows: The complaint, as we have already set forth, was an action for profits and an accounting. The defendants' answer contained denials and admissions, but raised no new issues. ▄▄▄ The answer is criticised in that the prayer was omitted. This point is raised for the first time upon appeal. The answer was treated as sufficient at the trial and this defect is no ground for a reversal at this time. (*Hoffman* v. *Pacific Coast Const. Co.*, 37 Cal. App.

125 [173 Pac. 776]; *Goldsmith* v. *Board of Education*, 63 Cal. App. 141 [218 Pac. 296].) ▉ Defendants Gray and Lena Abbott, the successors in interest by transfer from William Abbott, filed a cross-complaint alleging that they "have an interest *in certain of the lots* which are described in the complaint on file herein"; that the plaintiff claims an interest in said lots adverse to said cross-complainants which is without right. It prayed for a decree that their title be quieted against the plaintiff Sly. This cross-complaint is criticised for the defective description of the property to which title is sought to be quieted. At the time the cross-complaint was filed the original complaint had been superseded by an amended complaint. The reference in the description to the complaint may be therefore taken as a reference to the amended complaint, but the description says "in certain of the lots," without designating which ones. No demurrer, however, was filed. The plaintiff answered and in his answer to the cross-complaint he not only denied that the defendants William Abbott, John Gray, and Lena Abbott had any interest in any of the lots described in the complaint and amended complaint on file in the action, but also affirmatively alleged that he, the plaintiff, was the absolute owner of an undivided one-half interest in and to all the said lots. This affirmative allegation in the answer to the cross-complaint cures the defective description in the cross-complaint. (*Daggett* v. *Gray*, 110 Cal. 169 [42 Pac. 568]; *Kreling* v. *Kreling*, 118 Cal. 413 [50 Pac. 546].)

▉ The appellant's claim that the findings are outside of the issues raised by the pleadings is not based, however, upon the minor defects which we have just noticed. The claim is based upon the failure of either the answer or cross-complaint to allege abandonment, estoppel or forfeiture.

Respondents' reply to this point is simply that the findings thus attacked are superfluous and that the judgment is easily supported without them. So far as the judgment is a mere denial of the money judgment asked for by plaintiff, respondents' answer is easily sufficient. The judgment, however, goes further and quiets title against the plaintiff. Plaintiff is not only denied a money judgment but it is determined by the judgment that he has no right, title or interest in the property.

■ The cross-complaint and the answer thereto merely raised the issues of an ordinary suit to quiet title and do not by any express averment raise equitable issues such as estoppel. This fact raises the question of whether the facts occurring at the conference April 19, 1923, as found by the court, have the effect of divesting plaintiff of his legal title, if any he had, in the property, for it is well settled that one who relies upon estoppel or other facts of equitable cognizance as a basis for a decree quieting title must allege such facts in his pleading when he has the opportunity to do so.

■ The default of the plaintiff Sly in making the various payments as agreed effectually divested him of any title in the property as a matter of law and this without the aid of those findings on facts of equitable cognizance which apparently were not pleaded.

■ The relationship of Sly to Abbott should be considered to be essentially that of a coadventurer in a joint enterprise. This is justified by the evidence and is justified by the fact that the plaintiff's complaint is based upon that theory, and it is also the appellant's claim, as set forth at length in his briefs, that the interest of plaintiff was that of joint adventurer. ■ The nature of the title of a joint adventurer is that of a beneficiary of a constructive trust. (*Koyer* v. *Willmon,* 150 Cal. 785 [90 Pac. 135].) ■ Obviously the extent of his title is measured by the extent of his interest in the venture. To the extent that he is out of the venture he has no title. ■ A joint adventure in the purchase and sale of real estate may be formed by a parol agreement (*Koyer* v. *Willmon, supra*), and so may be likewise abandoned by parol agreement. ■ Consequently when plaintiff declared his inability to carry on and stated that he was out of the venture his interest terminated. He was no longer a beneficiary of the trust. Thereupon, the other associates were free to go forward with the enterprise, leaving him out. A case much like this one upon this point is *Commercial Bank* v. *Weldon,* 148 Cal. 601 [84 Pac. 171]. (See, also, *Miller* v. *Butterfield,* 79 Cal. 62 [21 Pac. 543].) This is not a case where one of the members of a joint adventure has performed his obligations with regard to some units of the enterprise undertaken and not as to others. Neither is it a case where one had made substantial contribu-

tion in labor or money up to a certain point and thereafter disassociated himself from his fellows. The plaintiff here defaulted almost at the beginning of the enterprise. The purchase of the lots called for some $87,000. Plaintiff's entire contribution was apparently a small portion of the initial payments upon some of the four contracts of purchase which he and Allen had made with Abbott. This enterprise was an entire one inasmuch as it faced failure as an entirety on account of the purchase payments not being made. On April 19, 1923, the associates were faced with a crisis. Entire failure threatened them because the original and real owners of the land demanded prompt payment of overdue installments on pain of forfeiture. The associates as a class failed and refused to pay and thereupon the real and original owners concluded the sale with Abbott, who first had the contracts in his name, and with Gray, who thereafter came into the deal. This was substantially the same conduct which is approved in *Commercial Bank* v. *Weldon, supra.*

The agreement of January 29, 1923, which we have referred to as merging all previous contracts and making the parties joint adventurers, also recited that it was the intention of the parties that the property was to be transferred to a trustee to be held in trust for the benefit of the parties in the proportion of one-quarter each. It also stated that this should be done forthwith, and the trust formed on the mutual understanding of the parties. The record does not show any document purporting to transfer to such a trustee. Apparently it was not done, although the testimony shows that Mr. Eagan was sometimes referred to as the trustee. If such a conveyance to a trustee were actually made the character of plaintiff's claimed title would not be thereby materially changed from that of a coadventurer or beneficiary of a constructive trust.

If the first four executory installment contracts for the purchase of real estate by Sly and Allen from Abbott were not entirely superseded by the merger agreement of January 29, 1923, Sly's title would be that of a vendee, which would terminate upon his unexcused default in installment payments and refusal to pay upon demand. As vendee, therefore, he could not prevail in an action to quiet

title brought against him by the vendor. (*Glock* v. *Howard & Wilson Colony Co.*, 123 Cal. 1 [69 Am. St. Rep. 17, 43 L. R. A. 199, 55 Pac. 713]; *Oursler* v. *Thacher*, 152 Cal. 739 [93 Pac. 1007]; *Darter* v. *Schuyler*, 47 Cal. App. 457 [190 Pac. 827]; *Catterline* v. *Peterson*, 60 Cal. App. 617 [213 Pac. 515].)

The court found that the $5,000 payment due from Sly to Abbott was not only due by virtue of the agreement of purchase of January 18, but also was due by virtue of Sly's agreement to pay said sum to Abbott in consideration of Abbott and the other associates taking Sly into the joint adventure January 29, 1923. Consequently, when Sly refused to make any further payments he not only violated his agreement with his associates to contribute his share of expenses necessary to go forward with the enterprise, but also defaulted in making the payment agreed to be made by him in consideration of his becoming a joint adventurer at all. His failure to make this payment then terminated his right to remain or become a joint adventurer in the same way that this default would terminate his right as a vendee.

The conclusion of the court that plaintiff has no right, title, or interest in the property is, therefore, a proper one independently of the finding of estoppel and is supported by the pleadings appearing in the judgment-roll brought here on appeal.

Error is assigned in the court's action in overruling plaintiff's objections to testimony and in denying his motions to strike out testimony. This testimony all relates to the conference of April 19. The objections and motions were made upon the ground that the evidence was outside of the pleadings but the evidence was admissible upon the issue of whether plaintiff was ready, willing, and able to perform his obligations and was also admissible upon the theory, as expressed by the trial court, that plaintiff himself, having first offered evidence of this conference, the defendants were at liberty to offer evidence in contradiction of that offered and in fact to show the entire conversation which occurred at one time and one place. (Code Civ. Proc., sec. 1854.)

The judgment is, therefore, affirmed.

Nourse, J., and Sturtevant, J., concurred.